It's hardly readable. I'll read what it says, Your Honor. It's hardly worth bringing posters like that to court, is it? Judge Kaczynski thought you were going to bring some other exhibits. We do have one. We had some other exhibits in the Google case, but we couldn't use them. We'll have a look at them. We have one, Your Honor. It'll be coming up soon. Good morning, Your Honors. I'm Jeff Malsner, along with Dan Cooper. I represent Perfect Ten. Otherwise known as the intemperate note writer. He must have written eight notes during that last argument. Sorry, Your Honor. I will discuss the errors made by the district court regarding Perfect Ten's claims for direct copyright infringement, Section 512A of the DMCA, and the CDA, the Communications Decency Act. Mr. Cooper will discuss Sections 512C and I of the DMCA.  The district court committed legal error by overlooking Perfect Ten's claim for direct copyright infringement, which was not even mentioned in its opinion. CCBIL was not only the authorized sales agent for hundreds of infringing websites, for which it earned 14.5% of their revenues. CCBIL, with CWIE, also had their own infringing websites, hornybees.com and ccbucks.com, which contain hundreds of infringing celebrity images, and at least one known infringing Perfect Ten image, which CCBIL and CWIE copied and displayed without permission. They used these websites to promote other infringing websites, which offered hundreds of infringing Perfect Ten images. Yes, there is. And there is evidence in the record that CCBIL and CWIE owned and controlled these websites. It's at ER 1640-1643. I have an example here of one of these documents. This is an email from the Executive Vice President of CCBIL and CWIE who refers to ccbucks as one of our websites and says that I strongly recommend that I review any changes on that website. 1640-1643 is other evidence of this. Mr. Mouser, does Perfect Ten agree that it didn't comply with 512C3 with respect to its own notices? No. Do not agree with that. And Mr. Cooper will walk through with these exhibits here. Let's hypothesize for a moment, put Perfect Ten aside. There's an allegation that there were third-party infringements, not Perfect Ten, who also notified CCBIL and the others of infringement. If you assume for a moment that they complied with 512C3, what evidence do you have that CCBIL did not reasonably implement a repeat infringer policy as to third parties, if any? Well, for one thing, it's stated right in the notices because there's notice after notice coming from these third parties saying we've told you about these websites, they are the worst repeat infringers in the world and you still have not done anything at all. Okay, I understand. With respect to the third parties, is there any evidence that the third parties themselves, whomever, ABC, notified CCBILs of an infringement? Yes. That's what these are. And the district court did not consider these third-party notices at all because it held that they were irrelevant, that the only relevant notices are the ones coming from Perfect Ten. And Mr. Cooper will discuss that in more detail. The 50-50 split that CCBIL had with these infringing websites is shown on this other exhibit over here, 1643, where it says 50-50 recurring payouts made weekly by CCBIL LLC. And as you can see, CCBIL is taking a much larger cut here of the revenues from these infringing websites than Visa and MasterCard do. And the way this kind of fits together is that CCBIL needs Visa or MasterCard to process these transactions. CCBIL calls itself the authorized sales agent for these websites and it provides other services, but it needs them to perform the transaction. Visa and MasterCard take a certain percentage, and CCBIL takes either 14.5% all the way up to 50% of these transactions. In light of the evidence that there is that CCBIL and CWIE own these infringing websites itself, it was improper for the district court to enter summary judgment on the direct copyright infringement claim. You're saying the district court just ignored that issue? It probably just slipped through the cracks because there were a large number of issues in the case. It was not ruled on. There's no mention of it in the opinion. Are you dealing with the DMCA log or are your co-counsels dealing with that? He's going to deal with the log. I will deal with Section 512A of the DMCA. The district court committed legal error by holding that CCBIL, a billing company that earns anywhere from 14.5% to 50% of the revenues from the sale of these infringing materials, and also ran its own websites, is entitled to a safe harbor under 512A. In order to qualify for 512A safe harbor, a service provider must first meet the definition set forth in 512K1A, which is very restrictive. The district court did not make this determination and, once again, did not even mention this in its opinion. Basically, it applies to pass-through service? Conduit. A conduit service provider. That's exactly right, Your Honor. If you have a server in, let's say, New York and you're downloading a page in California, it will make eight or ten hops in its way between the two machines, and A, you say, applies to all those immediate hops. Right. Basically, it applies to the phone company, cable companies, routers, the people who actually transmit the information over the Internet. And your claim as to CCBIL is that they perform what function? What CCBIL does is it processes credit cards. Is it any different than the Visa and MasterCard in the last case? It's kind of an intermediary between the websites and Visa and MasterCard. Often, there are websites who can't get a direct merchant account. I know what they are. What I'm saying is, in this case, are they in a different position vis-a-vis your client than was Visa and MasterCard? Well, they perform additional services to the credit card companies as well. So what else do they do? They provide these processing services when the website can't get their own account. You're just impeding yourself. That's just saying they're providing credit card services. Okay. But what they do is, when the credit card is processed... It's actually processed in the name of CCBIL. In other words, if you go onto a website and you join this website through CCBIL, you will get your credit card bill, and on your credit card bill, there will be a bill that says CCBIL. It won't say Bulgarian Infringing Website. That's like saying you get a smutty magazine on a plain brown envelope. But so what? No, no. What is the fact that the bill comes in their name rather than the ultimate website? What kind of function is that? What does that have to do with... Well, what does it do for the customer? It may only make a difference if they don't want the name of the website to show up on their credit card. The service is sanitizing the bill, the customer's credit card bill, by not showing smutty websites on there. That's part of what they do. Well, they perform this function of getting credit card processing when Visa or MasterCard won't do it because of financial reasons, that the website isn't solvent enough. They're high credit risk kinds of companies? Not only high credit risk, but also CCBIL tends to specialize in infringing adult websites. They also collect marketing information? They may. I don't know whether they do that or not. What do they do more than MasterCard or Visa? You say they deal with a high risk customer, but what do they do in addition to the kinds of services? They perform a function that's called scrubbing, which is they check for fraudulent transactions. Like if somebody is fraudulently using a credit card, they have lists or there's some way that they do it. Doesn't MasterCard and Visa do that also? These guys do it in addition to anything that Visa and MasterCard does. I don't know whether Visa and MasterCard do it or not. What is it that makes them a participant in the infringement either by carrying a liability or any other way more than MasterCard and Visa? Well, they provide these functions where the website can't get processing services. They provide it for them. And they know what is going on on the website. They have agreements with these customers, very detailed agreements, which allows them to review the customer's website and to thereby dictate the content that's on the website. They can make a customer take stuff off. What's different? Everything you have said has been exactly what's been alleged with MasterCard and Visa. And maybe your claim on this stands or falls, which will be decided in another case, and that's a perfectly good answer. And then we could just go on to something else. If you're going to come up with something more, you're going to say, even if we lose in that case, my client loses in that case, here's the extra stuff. Come up with something good. Come up with something that makes a difference, not the same stuff in a repackaged form. Do you understand what you're being asked? Talk about Romanian websites. CCBIL has affiliated websites. They have websites that they have contracts with. We know that, and if you want to go down to that argument, that's fine. We're talking about the ones that are not affiliated. Do they do anything vis-a-vis the ones that are not affiliated where they just provide billing services that is materially different from what Visa and MasterCard do in the prior case? Okay, when you're saying affiliated, I think you're referring to the ones that are affiliated with CCBucks and Horny Bees. Is that right? They only deal with websites that are affiliated with them. They only deal with websites that have contracts with them. The contracts are to provide these billing services, provide the scrubbing services to prevent fraud. CCBIL... What does Horny Bees do that makes it different here? Horny Bees and CCBucks are a hub website. People actually go onto these websites. You put into your browser www.hornybees.com. You go onto the website, and on the website there are thumbnail images from the affiliated websites. This is clearly not a conduit-type activity. No, that is not a conduit-type activity. Well, that's your primary argument. That's your distinction with, say, for example, a Visa MasterCard argument. At least with respect to Horny Bees, you're alleging that CCBills is in a business that's actively involved with the content, the infringing content. Is that right? Yes, and what they did is they took these thumbnails from the infringing websites. They actually put them onto their own website, so the infringing pictures appear on their website. But you made that argument ten minutes ago. And then you went on to say, in addition to the things that they actually own, here's this extra stuff that they do with respect to things that they don't own. And now you want to get into this sort of splitting of pairs about whether they're affiliated or not affiliated or whatnot. I don't think we're getting anywhere. Sure, if they own the website, but at that point, is there anything as to websites they don't own? They provide the passwords, usernames. They take a much larger percentage of the revenues than the credit card companies do. If you wanted to save six minutes, we'll give you six minutes, but you're down to about four and a half. I haven't talked about the CDA at all. Are there any questions that the Court has regarding the CDA, Communications Decency Act? Our main argument on the CDA is that Section 232... You can ask a question if you're going to go ahead and tell us anyway. What was the point of that? My name is Dan Cooper. I'm the General Counsel of Perfect Ten. And in the few minutes we have remaining here, maybe I should address Judge Smith's question about the DMCA notices themselves. That is the big question in the case, isn't it? Yeah, it is a big question, and there's going to be a quick change of exhibits, but I think I can introduce this here. Judge Kaczynski is hoping for something better. I don't know if it's going to quite satisfy what you're looking for, but it's close. It's a little better. You will be able to see from my face. I see a smile. A little better. Not bad, right? So the District Court's first error here was to rule that our actual notices were not DMCA compliant, because in its opinion, we didn't identify the URL of the allegedly infringing material. And I think I can show you here through these exhibits that this was a mistake. This is a page from ER 987 from our July 14, 2003 notice. And the purpose of the July 14 notice was to break down in spreadsheet format for defendants documents that we had previously produced to them in October 2002. So if you look at the first line here, it refers to a document number that's highlighted. It says 101-58-59, and it refers to an infringement of that model right there, whose name is John and Vicki So. Now, had defendants merely— Is there something at the bottom there? The bottom of which one? Of the picture that uses that number? Yes. I can't see the very bottom of the picture. Why don't you have your associates hold it up or something? There we go. Sorry. That's good. That's 101-58 right there. Okay. So having looked at the—they compared this and looked down to the October 2002 document collection, they found document number 101-58, and the key here, just to lower it down a little bit, is that this document up here has the exact URL at the top. So this is exactly what the judge said was missing. So all they had to do was look at this exact document, which is the infringement. About 8,000 times. Why not just put it in there? Well, the reason for that is that we were actually blocked, of course, as you're aware, from the record for a period of up to a year. So basically, at that time, we could not access their affiliated websites for a whole year, and there's evidence in the record of this. So the best that we could do under the circumstances was to refer back to our spreadsheet. You had this, right? We had this. Somebody could have taken that line on top and stuck it in the spreadsheet, right? I suppose that is a possibility, but I think that the key thing here to realize— Is it a yes or a no? I would say that it is a yes. How about just yes? Yes. Okay. So you could have done it. You didn't do it. Why isn't that the end of the case? Why is that what, I'm sorry? Why isn't that the end of the case? The reason it's not the end of the case is that the whole purpose of a DMCA notice is to provide the ISP with adequate information to find and examine the allegedly infringing material. But it's not a treasure hunt. No, it's not. You're supposed to give them information saying, look, here's the place where there's an infringement. Not if you sort of go through and you leaf through and you check a number and you check this other number. I mean, you do that—I mean, why should that burden fall upon the recipient when you and your client have the ability to give them information in the notice itself? I think the key fact to realize here is that Mr. Fisher, who is the executive vice president, admitted at his deposition that he had enough information based on this spreadsheet to find the material. And given this, the district court should have made an inference on summary judgment in our favor. The law requires notice. It requires notice in a certain form. Why is that not the case? You know, the Congress has said how you provide notice. You, for whatever reason, chose not to. And so you lose. What's so difficult about that? Once again, I do think the blocking factor has to be taken into account here. We simply could not— Talk to me about the blocking factor. You've already admitted that you had this information, and you could have put it in the notice when you sent it out. Do you take that back? No, I'm not taking that back. Okay. So what does blocking have to do with it? Well, blocking means that we couldn't access the websites for years. So basically, it would have been incredibly laborious for us to go through all this stuff. So what—Congress didn't say it's going to be easy. They didn't— Congress also didn't anticipate the copyright holder being thwarted from being able to identify its copyrighted material. I don't think that an ISP who blocks a copyright holder from being able to identify its copyrighted material is acting consistently with the spirit of the ISP. Let's go beyond that. Under 512c3, there are certain elements that have to be satisfied. Under A1i, a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed. Did you do that? We did that. Basically— That's not what the record shows. Well, the record does show that, actually, because the exact same July 14th spreadsheet that was sent was also sent in connection with interrogatory responses, which were verified— Was that done after the case was commenced? It was done in December 2003. Which was after the case was commenced. But in terms of complying with this, what about the statement that the information in the notification is accurate and under penalty of perjury? Did you do that? Again, in connection with the interrogatory responses. The answer is no. Yes or no. We did not do it at the time, originally, but— So you did it after the case was filed. That would be correct. Okay. But again, to me, the crucial— Why isn't that the end of the case, too? Why isn't that the end of your case, just as well?  Right there, they require you—Congress requires you to provide these notices under penalty of perjury. For a reason, because if you lie at that point, they can come after you. People are much more careful when they do that, rather than sending out a bunch of stuff which anybody can do. The 512C3 requirements that you were talking about, the six things, first of all, they only have to be met substantially. I mean, so it's not— You're suggesting that we don't, as a court, that we have the ability to overlook the fact that it wasn't under penalty of perjury, to overlook the fact that it didn't comply with every element of that? I think they are somewhat flexible, and again, I think that the crucial— Can you cite me to any case law, any legislative history? Well, I mean, one case I can cite to is the Alscan case, which is the Fourth Circuit case. And let's see if I can get the exact site for that. It's Alscan v. Remark at 239F3-619. Well, that doesn't—that does not say that you don't have to comply with 501C3, does it? No, but what it does—what happened there was the copyright holder identified websites, just domain names generally, and said that basically all the stuff on these sites is stolen. These sites are just devoted to theft, and basically pointed just to generalized theft. And that was treated as a compliant notice? Yes, that was compliant. And here, we actually think we did more because not only did we point them, and admittedly, maybe not in the exact prescribed format, but not only did we point them to the infringing URL highlighted up there, we actually gave them the infringing image itself. In the Fourth Circuit case, was the notice given before the complaint was filed? I believe it was. Well, that's different, is it not? Well, when we originally gave our notice, it was in October 2002. That was before the complaint here was filed. But it wasn't compliant. Sorry? It was not compliant. What exactly did you send out on that date? In October 2002 or July 2003? October. October 3, 2002, we sent out basically what you see right here. We sent out lots of those, essentially. The woman with the naval jewel. I'm sorry? The woman with the naval jewel, that's what you sent out? Is that what she has? Yeah. Well, we sent out a lot of those. We basically sent along a cover letter with that saying, almost in ALSCAN style, we said basically these are infringing printouts of ours, and, of course, the exact URL was located there. So they had the ability, if they just looked through those documents, to know exactly what it was. But you say it was very burdensome for you to do that. Why is it less so for them? Well, I mean, they're making money from selling our stolen content, so I'm not so sure. And you're doing this as a remissionary gesture? We're doing this to try to protect our intellectual property rights. But why? Are you giving all this money to charity? Is that what's going on? Are we giving the money to charity? Yeah. No, I mean, we're running a business. You're in a business, right? This is a business. A business that's lost a substantial sum. Lots of businesses have. Maybe you can go to Congress and get a subsidy. I don't know. That would be nice. That's not our issue. That would be nice. The point is, you're making money, or you're trying to make money. It's a business. They are trying to make money. That's a business, too. The difference is that we're trying to make money off of content that we own. They're taking 15 percent off of content that's stolen. I mean, that's the fundamental difference. And as far as the substantial compliance with the elements, I guess at the end of the day I would submit that. So these are the things you sent out before? O2. O2. Not under penalty of perjury, right? There was nothing. It was basically sent with a cover letter apprising them of the contents of the boxes and saying here are infringing images, URLs. May I suggest that that's very poor lawyer's work? I'm sorry? May I suggest that that's very poor lawyer's work? It could have probably been done better. I'm not saying it couldn't. No, no, no. I think what I'm saying is more correct. Okay. Fair enough. Poor lawyer's work. If a statute requires notification according to a certain form, including penalty of perjury, what excuse is there? I mean, how could it possibly hold that sufficient if it's not? Again, we're not relying on the October 2002 documents alone. It's in conjunction with the July 14th spreadsheet. And that's what Mr. Fisher sent us. And that was sent after the lawsuit was filed? That was after the lawsuit was filed. And I guess what I'm trying to say here overall is that the combination of these things apprise them of everything they needed to know to find the infringing material. And that's the whole purpose of a DMCA notice. So, I mean. But not in the way Congress intended, did it? It was not in the identical prescribed format that Congress intended. But we think that it's really an elevated. You think we can make up different rules than what the Congress intended as far as noticing? No, I don't think we're trying to make up different rules. But as Judge Kaczynski said before, everything is kind of on a case-by-case basis. And I think that here. So, in some cases we require under penalty of perjury. Some we don't. I just think. Under the content. I guess I just think that here if we elevate basically form over substance. You mean statutory language as opposed to what somebody else wants? No. Because we actually did comply. Every element I would submit is actually complied with. It just wasn't complied with in one clean, neat document. All in one document. So, we have a seriatim rule. I'm sorry. Where was the penalty of perjury? That would be in connection with the interrogatory responses. So, we basically submitted these July 14 notices. So, to put them together, you'd have to have these things sent out in October 2002. And then you'd have to have this thing, which was sent in July 2003? That's correct. And the interrogatory answers were sent out when? December of 2003. Okay. So, by the time you got all of that, you put a piece together. The compliance with the statute. That's what I would argue, yes. You know, if I were a judge, I'd want to write an opinion that said, you know, when Congress says you've got to do it, you've got to do it right. And once we do that, the next guy in your shoes will know to do it right. You could say that. I mean, that's a possibility. Clear up the law. You know, avoid unnecessary fine line drawing. Why on earth would we want to do anything else? I think the reason why it's important to do something else in this case is to examine the purpose behind a DMCA notice. To encourage sloppy lawyers? To reward poor compliance with statutory requirements? I mean, not to defend my own record, but the original notices were sent by the client who's not a lawyer. I should inform the court of that fact. Oh, I wasn't suggesting it was you personally. I know. To the extent it makes any difference. Well, it explains why there was such poor lawyering. There were no lawyers involved. So it makes me feel better about my profession. The bottom line is that Mr. Fisher said they knew about it. He said he had enough information to act on it, and they didn't take it down. Did we dot all the i's? Mr. Fisher is your client? No, Mr. Fisher is the executive vice president of Sheehan. Oh, that's right. Who is the client who sent this out? Dr. Zeta. This will be a very important, valuable lesson to him of the need to rely on lawyers. You know, you will thank us. Should increase his staff. Sorry? Should increase his staff, get more lawyers. You know, the general counsel would have more lawyers. It would be nice to have somebody to boss him around. I'm not going to lie. But I just think that the fact that their executive vice president said, I have enough information on which I can act, to me that should be the dispositive factor here. Well, that's more important than the congressional statute. It's not more important than the congressional statute, but I would say that between these notices and the December interrogatory responses, we substantially complied, which is all that is required. Substantial compliance. Three different documents, part of which were submitted after the complaint was filed, none of which except the interrogatories, which have nothing to do with this, complied with the under penalty. Even after the interrogatories in 03, they still never took it down. We still have evidence of it. They didn't give him notice, as required by the statute. Do we want to encourage somebody who obviously knows about something to not take it down? I think so. Really? I mean, I don't know. I think so. This will just mean that you'll finally send notice out just right. Can I just briefly address one other issue? Sure. Which is constructive notice. Even if you take aside our actual notices, we believe that there's many tribal issues of fact which show that they were aware of facts and circumstances from which infringing activity should have been apparent, even if you deem these defective. And these are called red flag websites. The judge described in his opinion, in her opinion rather, what red flag websites look like. And she said they typically use, quote, words such as pirate or bootleg or slang terms in their URL and header information to make their illegal purpose obvious. And just a few of the examples here. Now, the judge didn't find any red flags, but here are some of the highlights of the time that I have remaining if I do. I guess you don't have any time anymore. Can I just tick off a couple? You want to tick us off? No. Well, then I'll just point you to the brief. Is that all the time we've got? What do you think, John? I guess so. If there's no further questions, then I will sit. Thank you very much. Thank you. Thank you. The number in front of you is a maximum, not a minimum. I understand, Your Honor. One could spend substantially less time at the lectern. Hopefully I won't have to spend all the time. Go ahead. May it please the Court, my name is Jay Spillane, and with me is my co-counsel, John Flynn. We represent C.C. Bill and C.W.I.E. I will address the Court on the Digital Millennium Copyright Act issues, and my colleague, Mr. Flynn, would like to address the Court on the Cross Appeal  Your Honor, counsel for Perfect Ten, I think, confused the panel as to the lineup of the companies and what's the issue here. Did we look confused? I'm sorry, Your Honor? Did we look confused? Well, the statements that I heard from counsel were very inaccurate in terms of the companies  To answer Judge Smith's question, there was no controverted evidence in the record regarding the ownership of this website, Horny Bees. The uncontradicted evidence, it was owned by a defunct corporation called C.C. Bucks et al. C., which was not named in the complaint. There was no evidence to the contrary. I'll also point out in the record that the only, there's one singular supposedly You saw what they posted up here. That says something to the contrary. Are you suggesting that there is, it looks like there's some kind of a conflict of fact as to who owns that business. No, sir. There was no statement in the poster about who owned the business. There was some form of sales talk that the C.C. Bill people bring you this, but there was no statement as to the ownership of the website. It's Perfect Ten's contention that this is It's an email from page 1642 of the excerpt. Do you have that? It's supposed to be an email from Frank Cadwell. Do you know? I'm sorry, from Tom Fisher. Is this the same Mr. Fisher we've heard about? Yes, Your Honor. Mr. Fisher is employed with C.C. Bucks, excuse me, C.C. Bill and C.W.I.E. So if this is what it purports to be, which it looks like an email from Mr. Fisher to somebody called Frank Cadwell and Joel Paulin and Ron Cadwell, and he says, because of the Perfect Ten situation, I strongly recommend that I review any changes to our website, C.C. Bill, C.W.I.E. and C.C. Bucks. Yes, it seems to be an admission by Mr. Fisher that C.C. Bucks is one of our websites. And the Two Cows piece, Exhibit 161, page 2525, under the domain name Horny Bees, the registrant is C.W.I.E., LLC, one of the defendants. Well, Your Honor, let's recall that Perfect Ten says this is a case of direct liabilities. The singular instance has nothing to do with the DMC issues, which you're talking about with respect to C.C. Bill and C.W.I.E. It is without controversy that this site was owned by an LLC called C.C. Bucks, LLC, which I believe is in turn owned in part by the Cadwells. This does not say that either C.C. Bill or C.W.I.E., which are also limited liability companies, were the owners of the website HornyBees.com. You're saying they just didn't allege it properly? They did not allege a secondary – well, it's not just an allegation. This case comes up on cross-margin presumery judgment. So they claimed that this was a direct liability issue. They never pled, nor is there any evidence that C.C. Bill or C.W.I.E. has some form of secondary responsibility for the website owned by C.C. Bucks, LLC. The two cows information, which is unauthenticated, and I don't see the time here, but if we go past that, it simply says that the Horny Bees site was served by C.W.I.E. That suggests the date of a printout. That simply says that HornyBees.com was served on the C.W.I.E. server, which if they had chose to make it an issue in the case, they would not have brought up a 512c issue. With respect to the singular picture of which there's proof of supposedly the one picture on the website. Now I've lost the page that it's on. It's a single picture, supposedly, of the head of Jennifer Lopez with the body of a Perfect 10 model. Here it is. It's ER 1655. The URL indicates that that picture was on a website called web.archive.org. If you follow the string of forward slashes, it further suggests that it came from illegal.net and referred to C.C. Bucks down the line. There was no evidence even that this picture was on HornyBees.com. In the main, this is a case where we have C.C. Bill, which has arms-length contracts with third parties, with respect to whom C.C. Bill provides payment processing services, and C.W.I.E., which has arms-length contracts with third parties to provide hosting services. Here we have a case to vindicate the intentions of Congress when in the late 1990s it considered and held hearings regarding the plea of service providers to have some certainty in the rules by which they must play. Service providers such as my clients have content owners such as Perfect 10 on the one side, and they have their clients on the other, and the plea of the service providers was please provide some objectivity and some certainty so we know what we have to do or not have to do. Let's go, if we may, then, to some of these threshold requirements, because I know you're anxious to get to those. The 512I is the threshold requirement before you get to the other safe harbors, and that provides that people who satisfy this requirement reasonably implemented a policy that provides for the termination of appropriate circumstances of repeat infringers. Under our circuit law in Ellison and Amester, we've adopted a requirement that there be no purposeful evisceration. On the other hand, there's the concept of whether this should be a good-faith implementation. What is your perspective on that? What's your client's perspective? Well, we agree with the concept that there should be good-faith implementation. Of course, the statute itself says that there shall be adoption and reasonable implementation of the policy. So the question is you're saying that if there is a material issue of fact as to whether you have reasonably applied it in good faith, then there would be a triable issue of fact? No, Your Honor. I'm saying this case is a great example. The facts in this case were many, but they were not disputed. It was not disputed what happened. What happened was the CC Bill and CWOE did adopt and reasonably implement a repeat infringer policy. We had the declaration. But they've alleged that you didn't. They said you adopted one, but that you didn't reasonably implement it. Well, they say that, but there wasn't evidence of that in the record. Mr. Fisher had supplied two declarations. One was with our opening summary judgment papers, and the second was a reply declaration. In that declaration, Mr. Fisher presented the acceptable use policy program of CC Bill and CWOE. He presented an index of all the documents we produced in the case by base number that reflected CC Bill and CWOE receiving and then responding to notifications from parties. Mr. Fisher submitted his Exhibit C to his original declaration and then Exhibit G to his reply declaration, a DMCA log that he maintained, tracking all the contacts that he received from various parties in the response of CC Bill and CWOE thereto. And he declared in his declarations that to the extent of their ability and the information given, if they received a good notification, they responded and there was a satisfactory outcome. There was no material evidence to contradict this. A perfect 10 relies upon hyperbole and misrepresentations of the record, anecdotes, hearsay evidence to suggest that it was otherwise. But CWID did have on its site these thumbnail sketches, did it not, or photographs of allegedly infringing material? So its people could select which ones they wanted? CWOE is a web hosting company. I understand. It's one of the defendants, right? One of the defendants. And what it does is it provides services whereby its clients, with whom it has a contract, can place their websites on CWOE's servers. Now, CWOE does not have the ability to go in and plug off a picture. In many cases, it can't even go in and plug off an individual website on a server. But it's not just a conduit. It's not just a conduit, though, is it? No. The word conduit doesn't appear anywhere in 512. And no one suggested, there's been a suggestion that the word conduit applies to 512A, which, of course, isn't in the statute. But if we need to work with the term conduit, CCBucks serves as a conduit through which information about credit card and billing and username and passwords, of course, through its system. So it has some control over what's on the site? I'm sorry, what company? It has some control over what's on the site, does it not? Are we discussing CWOE? CWOE. CWOE maintains the servers upon which the websites sit. If it's control at all, and it's not legal control for purposes of vicarious liability, it would be to go to the wall and unplug it so that everything that's sitting on the server, the websites of that client, the websites of other clients, would be off the Internet. Has CWOE ever removed an image or images from its site? Yes, sir. Based upon what? Mr. Fisher's declaration testimony was uncontradicted. Among the things he submitted was a boil-down of its DMCA log reflecting the instances in which either CCBill or CWOE had satisfied themselves that they had sent enough notifications or a request to respond to a client that they became a repeat infringer and that client services were terminated. It really is in a position to do that and has shown in the past that it can do that. What is the that that we're talking about? The 512A and C deal with infringements. 512I deals with infringers. All that CCBill and CWOE can do with respect to infringers is if they receive a persistent enough pattern of compliant notifications so that they can satisfy themselves that one of their clients is a repeat infringer, then they can terminate services to that client. But 512C says, with respect to an infringement, a particular image, that CWOE is not under a burden to unplug that server from the wall, accept and respond to a compliant notification. You keep talking about unplugging the server from the wall, but that's not all they can do. They can block the IP address associated with a particular website and leave every other webpage on the server to operate. They can block that. No, sir, that wasn't the evidence. There are very limited instances in which CWOE's clients grant. I can do it from my server at home, so I'm sure that you can do it. Well. I mean, the way you reach a website is by association with an IP address. If the IP address is associated with your particular server, that can be changed. It's Charles' play to do it. CWOE has a contractual relationship with its clients, which would not authorize it to block in that fashion. Well, but you can. You can. So standing there saying all we can do is unplug the server is really not entirely truthful. I'm not aware of any evidence in the record that CWOE had that capability. Perhaps Your Honor knows the Internet better than I do, and Your Honor could accomplish that. But CWOE has a contract. Please, counsel. Everybody in this room knows that they can do something more than unplug the server. If there's a web page on a server, there are many ways of blocking access to that web page without unplugging the server. I don't know who you think you're fooling, even to suggest otherwise. Your Honor. You should probably go on to your next point. CWOE has no burden to do that, even if it has the capability, until it receives a complaint notification, of which there is no dispute that it does not. That's a good point. That's one you could have argued. You should have argued, or just left it. I mean, the question is, did they get compliant notice? That is certainly a very good thing to argue. I apologize, Your Honor. I was trying to respond to Judge Smith's question. Are you dividing your time with your co-counsel, or are you taking it out? I'm dividing the time. I'd like to address the notice, and I'll yield the balance of my time to Mr. Flynn on the cross-appeal, unless the Court wants to give me a minute of rebuttal. The ALS scan case does not say that a- That's the Fourth Circuit case. That's the Fourth Circuit case. It does not say that a rights holder can do what this rights holder did, which is affirmatively, positively, consciously eschew and refuse to provide in notifications key elements, including the statement of good faith belief and the signature of penalty of perjury. Nowhere does it so provide. What that case says is that if you provide all six of the elements, and within a singular element, there's a question of reasonable compliance. The Court will look at that. I think in the ALS scan case, on one of the elements, which is which infringements are you talking about, the point was that the entirety of the images on the ALS.scan something were the infringements. So the Court said you didn't have to list one through 1,000 if it was the totality. But there they did have the statement under penalty of perjury and the other factors. Unless the panel has other questions of me regarding the points I've raised, I'd like to yield to my co-counsel, Mr. Flynn, to rise to the cross-appeal. Good morning. May it please the Court. I'm John Flynn, here representing CWI and CC Bill as well. I'll be addressing the issues on cross-appeal related to the CBA, as well as the trial court's denial of our fee award as the prevailing party under the Copyright Act. I'm going to focus. You do concede there's a disputed issue of material fact, and the question of why, whether or not a plaintiff was prevented from doing monitoring of the website. Do I agree that there's a question of fact, Your Honor? You do agree that there's a disaccord on that. I do agree. I do not agree with that, Your Honor. My recollection of the record. They say they were cut off because they brought this lawsuit. You guys say because there was a billing problem, charge-back problem. Why isn't that the stuff of which the jury's deciding? Your Honor, I do agree with your description of the party's positions. The evidence, as I saw it, demonstrated a continuing pre-lawsuit unrelated to Perfect Ten. Through the present date, implementation of policies concerning charge-backs, fraud, the implementation of normal standard operating procedures that would happen if you were charging or I were charging or anybody else were charging, as relates to high incidence of charge-backs, fraud. They were cut off suspiciously after bringing the lawsuit, and they say it had really nothing to do with it. Your Honor, that was an excuse. The fact is you don't want us going around checking on your service to see whether there are infringements. This is a convenient way for you to total subterfuge to keep us from policing your service. Then we have to look at the statutory provisions within the DMCA, look at 512I1B as relates to standard technical measures, and that's not what we're talking about. I understand the point you're raising, and I'm trying to address it directly. That is not a standard technical measure as defined statutorily in the DMCA. I quote, as used in this subsection, the term standard technical measure means technical measures that are used by copyright owners to identify or protect copyrighted works and have been deployed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process are available to any person on reasonable and non-discriminatory terms and do not impose substantial costs on service providers or substantial burdens on their systems or networks. How is cutting off their ability to pay the fee and get onto the websites on your server and police and look around and see whether they're infringing images, how could that not be a standard measure? It doesn't, from my reading of this definition within the DMCA, that doesn't fit within this definition you're talking about. I read the definition, but I didn't, to me, it's still directly the situation. I don't understand how you could argue otherwise. What is non-standard about it? What is more standard than saying we're going to police, it's like going to the flea market, and we're going to walk up and down the aisles and see if there are copyright infringing people selling DVDs that infringe copyright? What is more standard than saying we're going to buy a subscription and we're going to go in and we're going to look and we're going to see whether any of our property is being stolen there? It is absolutely a standard procedure that we're dealing with here. It's a standard procedure concerning the commercial exchange of money and the purchase of materials, whatever those materials may be, with CCBIL acting as a billing intermediary. It is not a standard measure that's been developed pursuant to a broad consensus of copyright owners in an open firm and multi-industry standards process. It's a standard process concerning the billing of an exchange which happens over the Internet. It is not in any way fitting within the DMCA's definitional framework as provided by Congress concerning mechanisms that are used to deploy standard technical measures to protect copywritten works. It's a standard billing procedure. Is that what the district court held? Excuse me? Is that what the district court held? The district court focused, as I recall, Your Honor, and I hope I'm not misspeaking. I apologize if I am. My recollection is that the issue was that there was no genuine issue of fact as related to what happened concerning our client's deployment of its standard operating procedures. That's my recollection. It was wrong in that regard. Do you agree with that? The district court erred in that regard. I do not disagree with that, Your Honor. I believe that the evidence as presented in the record. Do not disagree means you agree. I believe. I wish to make sure I understand what you're saying. Do you agree that the district court erred in its rationale? No, I do not, Your Honor. Okay. Explain to me that. I believe that the district court looked at the evidence and concluded that there was no genuine issue relative to our client's deploying its same business model that it deploys with respect to anybody pursuing charging of transactions over the Internet. Right. That's what I started out asking you about, and that's when you sort of went and said, oh, well, this is not one of those measures anyway. So back where my question started four minutes ago, five minutes ago, they say, look, no, you say that you did it pursuant to your business practices. We say you did it because you don't want us snooping around your website, that, in fact, we paid our bills on time, we did not have excessive chargebacks, and all the reasons you have a complete subterfuge. Why is that exactly? If you want to rest it on that theory, you have to have undisputed issues of fact. If you want to say the district court was right on that point. And I don't see how you can say that. I think I understand the point that you're making. It wasn't a standard technical measure. That's gratifying to me. I'm certain it often is, and I'm sorry if I was a little slow on the uptake there. But I do believe that it's clear on the record that it wasn't a standard technical measure. And you don't think that they are disputing it? I certainly hear them disputing it today. And you don't think they're disputing the record? So if I go back and I look in the record and I find a dispute, you lose, right? You lose. I do lose. There certainly were disputes on that issue, Your Honor. Since we got that resolved, I want to go to the attorney fee issue because you're out of time here. The Supreme Court in the Fogarty case adopted the lead factors in analyzing whether attorney fees should be paid. Yes, sir. Do you agree that the standard by which we review this is abuse of discretion? Yes, sir. Do you agree that the district court reviewed every one of the lead factors and came out with reasons for denying the fees? Yes, sir. I believe the district court, trying to answer the question directly, yes. And you're suggesting that what the court did in that case was an abuse of discretion? Yes, sir. On what basis? Although when you tick through the five factors that the court identified in its order, the degree of success obtained, obviously we were successful in the Copyright Act, so that's kind of a given, that's a throwaway. But when you start to look at the other factors, what you see here is a focus, understandably, on the parameters of the safe harbor definitions and how to fit within that in an unproven area of law, and a complete and total ignoring of the overwhelming weight of evidence, which every one of the judges, I think, has asked about today as it relates to the notices. Our clients spent hundreds of thousands of dollars and untold man hours with raw pornographic document dumps of pages of data without following with the simplest black letter, fourth grade able to read notice provision set forth in the statute. And it was gamesmanship. And it was inappropriate. And it should not be allowed and be countenanced. So you're basically saying that the reason why there should be attorney fees awarded here is because it was gamesmanship, not because the court failed to follow the lead factor. Actually, I do have a few more points. I do believe that if you look at the most overarching important factor, which is the purpose of the Copyright Act, and you would try to apply that in an even-handed approach as required under Fantasy v. Fogarty, and even applying the lead factors, even when you deal with issues related to the safe harbor and the untested waters, uncharted course, our clients were dutiful and diligent in pursuing and explaining the parameters of that law in an untested area. How much time did your lawyers spend looking at the pornographic materials, did you say? The paralegals, unfortunately, had a daunting task with box upon box of documentation. But, Your Honor, when you go back and look at the record, as I'm sure you already have, please take note of the notices, please take note of the timing, which Judge Smith did point out. The pre-notices simply said, here's a bunch of boxes. There's some copywritten materials in there. Then you have the post-litigation gamesmanship with the spreadsheets. And I'm a fairly bright guy, although Judge Kaczynski might disagree with my inability to follow his question, but I couldn't follow many of them, and they didn't say what they said. And you had that type of gamesmanship working its way from pre-litigation through the litigation, while we dealt with the safe harbor contours and what should appropriately apply under the DMCA. And the judge, you may feel the district court judge didn't understand that. He didn't understand your plea about that. I do not believe that she considered the evidence, the uncontroverted evidence, which if you look at her order granting in part and denying in part the motion for summary judgment, you will see your point raised repeatedly about this abject refusal to comply with the notice, the simple, relatively simple notice. This issue came up on what, the motion for reconsideration? Yeah. She had the judge improvidently denied fees when we filed our form of judgment instead of waiting for the process to happen. We filed a motion for reconsideration, brought up these issues and the factors, and then the judge went back in our responsible opinion and gave fairly short shrift to the factors, really conflating the issues of frivolity and unreasonableness and ignoring the purpose of the Copyright Act and ignoring all of those notices. Was there anything being considered in the motion for reconsideration other than the attorney fees at that point? No, sir. That was the sole focus of the district courts. I think the caption was motion for reconsideration, and then it was an application for attorney fees filed contemporaneously. That was the only issue that was raised, Your Honor. Thank you, counsel. Thank you, Your Honor. You're well over, but we'll give you a couple of minutes. Just a few minutes, Your Honor. Judge Smith pointed out an additional document to this. There's also 1640, which says, brought to you by C.C. Bill, LLC, and Cave Creek Web Hosting, which is CWIE, C.C. Bucks, and Horny Bees, and then it goes on to talk about them. So there is definitely sufficient evidence in the record of their ownership. The conduit language regarding 512A is found in the case law. It's in this Court's opinion in Ellison, also in the Eighth Circuit's opinion in Charter Communications, and C.C. Bill clearly does not meet this conduit requirement, or also the requirement that the material that passes through the conduit must be the allegedly infringing material. It's not for passwords or usernames. Unless there are any... Oh, one thing I also wanted to mention was passwords, which wasn't mentioned by anyone, that CWIE hosted websites that gave out passwords of Perfect Ten's websites and never took those down. Unless there are any other questions, that's it. Thank you, Counsel. Thank you, Your Honor. The argument will be submitted. The Court will stand in recess until the day.
judges: Reinhardt, Kozinski, Smith